KEMNITZER, BARRON & KRIEG, LLP
ADAM J. MCNEILE          Bar No. 280296
KRISTIN KEMNITZER      Bar No. 278946
1120 Mar West St., Ste C2
Tiburon, CA 94920
Telephone: (415) 632-1900
Facsimile: (415) 632-1901
adam@kbklegal.com
kristin@kbklegal.com

[Co-Counsel Information On Following Page]

Attorneys for Plaintiffs AMELIA PEREZ and DANIEL PEREZ

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMELIA PEREZ and DANIEL PEREZ,<br><br>                      Plaintiff,<br><br>     vs.<br><br>GOODLEAP, LLC; and DOES 1 through 20, inclusive,<br><br>                      Defendants.<br><br>_____/ | **Case No. 5:24-cv-00075**<br><br>**COMPLAINT FOR:**<br>I.    **FRAUDULENT MISREPRESENTATION AND CONCEALMENT;**<br>II.   **VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT (CIVIL CODE §1750, *ET SEQ.*);**<br>III. **VIOLATIONS OF THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT (WELFARE & INSTITUTIONS CODE §15610.07, *ET SEQ.*);**<br>IV. **VIOLATIONS OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. 1681, *ET SEQ.*);**<br>V.  **VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT (CIVIL CODE §1788, *ET SEQ.*);**<br>VI. **VIOLATIONS OF THE HOME SOLICITATION SALES ACT (CIVIL CODE §1689.5, *ET SEQ.*);**<br>VII. **VIOLATIONS OF BUSINESS AND PROFESSIONS CODE §7150, *ET SEQ.*;**<br>VIII. **VIOLATIONS OF THE TRUTH IN LENDING ACT (15 U.S.C. §1601, *ET SEQ.*); AND**<br>IX. **VIOLATIONS OF THE UNFAIR COMPETITION LAW (BUSINESS & PROFESSIONS CODE §17200, *ET SEQ.*)**<br><br>Unlimited Civil Case<br>JURY TRIAL DEMANDED |

HOUSING AND ECONOMIC RIGHTS ADVOCATES
JOSEPH JARAMILLO            Bar No. 178566
P.O. Box 29435
Oakland, CA  94604-9435
Telephone: (510) 271-8443
Facsimile: (510) 868-4521
jjaramillo@heraca.org

**INTRODUCTION**

1.      This case involves a scheme in which Defendant GOODLEAP LLC ("GOODLEAP") partners with unscrupulous door-to-door salespersons and contractors to target vulnerable consumers for the fraudulent sale and onerous "financing" of solar panels. Plaintiffs are a married husband (Daniel Perez) and wife (Amelia Perez) (together, "Plaintiffs") who are both 74 years old and live in a modest home in Adelanto, California that they purchased in 2015. Plaintiffs are monolingual Spanish speakers who cannot read or write in English. Plaintiffs subsist on combined Social Security benefits of approximately $2,200 per month.

2.      GOODLEAP and its door-to-door sales agents preyed on Plaintiffs, fraudulently affixing their electronic signatures on a loan for solar panels that neither of them agreed to, pulling their credit for an unauthorized purpose, and attempting to collect on the fraudulent loans – even threatening them with legal action if they did not pay. On top of the fraudulent loans made in their names, GOODLEAP's partner solar panel installer Pacific Energy Network ("PEN") put solar panels on Plaintiffs' home that never functioned and are not permitted, damaging their home in the process.

3.      The fraudulent loan for non-functioning solar panels is not a mere trifle – it is for $27,708.89, with finance charges of $16,673.08 over 25 years. One may ask what is in it for GOODLEAP to make fraudulent loans? The answer is simple – it takes an undisclosed "kickback" on every loan it funds and then securitizes and sells the loans to various financial institutions. GOODLEAP then continues to "service" the loans, also taking a fee for this as well.[1] GOODLEAP therefore insulates itself from the risk of these bad loans – spreading the risk from the fraudulent loans out among multiple other downstream purchasers of the securitized loans.

---

[1] *See* https://www.managementstudyguide.com/goodleap-business-model.htm (last visited January 9, 2024).

The entire enterprise is eerily reminiscent of the mortgage-backed securities crisis of 2007-08.

4.	To keep the flow of loans (and profits), GOODLEAP authorizes door-to-door salespeople like those of PEN to sign consumers like Plaintiffs up for multi-decade loans that provide almost no value to the consumer. GOODLEAP gives these salespersons near carte blanche authority to enter "customers'" homes on GoodLeap's behalf, sign up "customers" for GoodLeap loans, obtain credit information of the "customers," facilitate the completion of loan applications, and send out the loan documents to the "customers." However, after providing this authority to the salespersons, GoodLeap systematically and purposefully fails to exercise oversight over these salespersons, rubber stamping the loan applications that the salespersons initiate and ratifying even fraudulently procured loan agreements. Plaintiffs, through no fault of their own, fell victim to this trap. Neither Plaintiff signed *any* agreement with GOODLEAP, let alone an enforceable agreement.

5.	In January 2023, a Spanish-speaking door-to-door salesperson who said his name was "Mark Orozco," who GOODLEAP vested with broad authority as set forth in the preceding paragraph, showed up at Plaintiffs' door. Mark spoke only with Amelia, and they spoke only in Spanish. Amelia provided Mark with some information, which Mark input into a tablet he had with him. Mark showed Amelia several screens on his tablet, which were all in English. He told her she could get solar energy for $104 per month for 19 years, which would completely replace payments to Southern California Edison. Amelia touched some spots on Mark's tablet but did not understand she was signing for any loan. Regardless, she could not read it because it was in English.

6.	Mark did not provide Amelia with any copies of documents and never informed her of any right to cancel. Instead, Mark passed Plaintiffs' personal information to GOODLEAP, used it to pull Plaintiffs' credit without authorization, and entered Plaintiffs into a loan for solar panels they never agreed to. In fact, Daniel never even spoke to Mark or anyone else with GOODLEAP, let alone sign any documents.

7.	After some weeks passed, in or about February 2023 some workers came to put panels on Plaintiffs' roof. Amelia stopped them because she had never received any paperwork. Mark then

came by and provided Amelia with a printed document in English, which she did not understand; nonetheless, she felt pressured to let the workers put the solar panels on the roof. PEN never finished the job, never obtained permitting, and the solar panels have never functioned. On May 1, 2023, Plaintiffs were even more surprised when GOODLEAP made an automatic ACH withdrawal of $105 from Plaintiffs' bank account for the non-functioning solar panels to which they never agreed. Plaintiffs did not know who GOODLEAP was at this point, so they asked their bank to block the payment.

8.      GOODLEAP then began a collection campaign for this fraudulent loan for solar panels that never worked. Plaintiffs told GOODLEAP that whatever loan GOODLEAP had made was fraudulent, but GOODLEAP denied all liability and told Plaintiffs to direct their concerns at PEN. PEN went out of business. GOODLEAP persisted with its collection attempts, which resulted in Daniel having to go to the hospital from the stress GOODLEAP caused him.

9.      It was not until later when Plaintiffs obtained a copy of the alleged GOODLEAP loan agreement that they realized the loan agreement was signed using a fabricated email address for Daniel – danielperez76756@gmail.com. Daniel does not use email, has never had access to that email address, never created that email address, and never authorized anyone to create that email address for him, let alone sign any documents using it.

10.      Plaintiffs then sent GOODLEAP and PEN letters canceling any contracts in a letter dated October 4, 2023. To this day, despite Plaintiffs lawfully cancelling any and all alleged contracts (which, regardless, were void *ab initio*), GOODLEAP continues to insist the loan is still valid, and it has failed and refused to remove a lien it placed on Plaintiffs' property concerning the solar panels.

11.      Plaintiffs bring this action for Fraudulent Misrepresentation and Concealment and violations of the Consumers Legal Remedies Act, Civ. Code §1750, *et seq.* (the "CLRA"); the Elder Abuse And Dependent Adult Civil Protection Act, Welfare & Institutions Code §15610.07, *et seq.* ("EADACPA"); the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.* (the "FCRA"); the Rosenthal Fair Debt Collection Practices Act, Civ. Code §1788, *et seq.* (the "Rosenthal Act"); the Home Solicitation Sales Act, Civ. Code §1689.5, *et seq.* (the "HSSA"); Bus & Prof.

Code §7150 *et seq.*; the Truth in Lending Act, 15 U.S.C. §1601, *et seq.* ("TILA"); the Unfair Competition Law, Bus & Prof. Code §17200, *et seq.* (the "UCL") and to obtain actual, statutory, civil, treble, and punitive damages for the harm that they have suffered. Plaintiffs also seek a public injunction against GOODLEAP, to enjoin its unlawful, unfair, and fraudulent conduct.

## PARTIES

12.     Plaintiffs are individuals over the age of 18 years. At all times relevant herein, Plaintiffs were, and currently are, residents of the State of California, County of Los Angeles.

13.     Defendant GOODLEAP is, and at all times relevant herein was, a California corporation with its principal place of business in California, that at all times relevant herein was licensed to do business and was conducting business in California.

14.     At all times relevant hereto, GOODLEAP extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action is initially payable, making GOODLEAP a creditor within the meaning of TILA, 15 U.S.C. §1602(g).

## DOE DEFENDANTS

15.     Plaintiffs do not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise, of Defendants sued herein as DOES 1 through 20, inclusive, pursuant to §474 of the California Code of Civil Procedure. Nonetheless, Plaintiffs allege that Defendants DOES 1 through 20, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein and are legally liable to Plaintiff. Plaintiffs will seek leave to amend this complaint to set forth the true names and capacities of the DOE Defendants, together with appropriate charging allegations, if and when ascertained.

## THE HOLDER RULE

16.     All claims and defenses that Plaintiffs have against PEN arising out of the fraudulent transaction are also valid against GOODLEAP, because GOODLEAP is the holder of any alleged consumer credit contract. Given the violations of law alleged below, and the Federal Trade Commission Holder in Due Course rule, 16 C.F.R. §433, *et seq.*, which subjects the holder

of a consumer credit contract to all claims and defenses of the consumer against the seller, GOODLEAP is subject to all claims and defenses Plaintiffs may have against PEN.

### AGENCY

17.     Plaintiffs are informed, believe and thereon allege that at all times mentioned herein, each Defendant, whether actually or fictitiously named, was the principal, agent (actual or ostensible), or employee of each other Defendant. In acting as such principal or within the course and scope of such employment or agency, each Defendant took some part in the acts and omissions hereinafter set forth, by reason of which each Defendant is liable to Plaintiffs for the relief prayed for herein.

18.     Furthermore, Plaintiffs are informed, believe and thereon allege that at all times mentioned herein PEN employees and/or representatives act as agents and at the direction of GOODLEAP as part of the GOODLEAP Program described below. GOODLEAP retained the right to control the conduct of PEN, including by (1) requiring PEN sales agents to use specific software, applications, and technology when engaging in transactions with consumers on GOODLEAP's behalf; (2) controlling the GOODLEAP products PEN sales agents could offer, the terms and conditions of the products offered, the method of presentation of the products offered, and the contractual documents that could be utilized; (3) controlling the marketing and sales tactics of the PEN and its sales agents; (4) retaining the right to discipline PEN and sales agents for violations of policies and procedures set by GOODLEAP. At all times, GOODLEAP has ratified the conduct of PEN and its sales agents, including in the instant case.

### JURISDICTION AND VENUE

19.     This Court has federal subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §1331. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367(a).

20.     Venue is proper in the Central District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. § 1391(b)(2).

# FACTUAL ALLEGATIONS

## The Consumer Solar Panel Industry

21.    The solar industry is one of the fastest growing global industries, with a global valuation of $154.47 billion in 2020, and estimated to balloon to over $1 trillion by 2028.[2] Though green energy in theory is a noble goal, the exponential growth in the industry has led to an exponential growth of fraud, with little to no oversight.

22.    GOODLEAP oversees and then ratifies the fraud perpetrated by its agents such as PEN and PEN's salespersons. As GOODLEAP is well aware, the solar panel installation business is heavily populated with deceptive and dishonest contractors (with which it partners) targeting, preying upon, and ripping off vulnerable consumers.[3]

---

[2] *See Solar Photovoltaic Market Size [2021-2028] USD 1,00.92 Billion*, Apr. 25, 2022, https://finance.yahoo.com/news/solar-photovoltaic-market-size-2021-120400068.html (last visited on October 19, 2022).

[3] *See*, *e.g.*, *U.S. v. Vivint Smart Home, Inc.*, Case No. 2:21-cv-00267-TS (D. UT 2021) (stipulated order for permanent injunction and civil penalty judgment for Vivint's violation of the FTC's "Red Flags Rule" involving identity theft); *New Mexico v. Vivint Solar, Inc.*, Case No. D-202-CV-201801936 (lawsuit by New Mexico Attorney General alleging solar panel installation contractor engaged in unfair and deceptive practices including fraudulently inducing consumers to enter into twenty-year power purchase agreements which would purportedly save them significant amounts of money); *State of Minnesota, by its Attorney General Keith Ellison v. Brio Energy LLC et al.*, Hennepin County, Case No. 27-CV-22-6187 (lawsuit by Minnesota Attorney General against four Utah-based solar panel companies alleging they lied about their relationship with Minnesota utilities, misrepresented financial benefits of purchasing solar panels, and tricked consumers into signing binding sales contracts and loan agreements); Alana Samuels, *Rooftop Solar Power Has a Dark Side*, TIME, September 26, 2023, available at https://time.com/6317339/rooftop-solar-power-failure/ (last visited October 2, 2023); Bailey Schulz, *New Jersey Solar Company Allegedly Pressured Vulnerable Populations Into Contracts for a 'Shoddy Product'*, USA TODAY, April 12, 2023, available at https://www.usatoday.com/story/money/2023/04/10/vision-solar-panel-lawsuit/11600307002/ (last visited on September 22, 2023) (detailing class action suit filed in New Jersey on behalf of plaintiffs from five States alleging that solar panel leasing company Vision Solar salespeople used high-pressure sales tactics to convince homeowners - including low-income, disabled and elderly individuals - to purchase or lease solar panel systems); Press Release, Office of the Attorney General of the State of Kentucky, *Attorney General Cameron Leads Nine States in Urging Five Solar Lender Companies to Suspend Financial Obligations For Pink Energy Consumers*, November 22, 2022, available at https://www.kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=1287 (last visited October 1, 2023); Press Release, Office of the Attorney General State of Idaho, *Attorney General Issues Tips for Homeowners on Solar Installations*, February 21, 2022, available at https://www.ag.idaho.gov/newsroom/attorney-general-issues-tips-for-homeowners-on-solar-installations/ (last visited September 22, 2023) (reporting the Idaho AG issued a consumer alert regarding solar companies' use of misleading sales tactics through door-to-door sales and social media advertisements); Lauren Trager, *Missouri Attorney General Sues Solar Panel Company After Customer Complaints, News 4 Investigation*, KMOV, September 30, 2022, available at https://www.kmov.com/2022/10/01/missouri-attorney-general-sues-solar-power-company-after-

GOODLEAP'S scheme

## **GOODLEAP's Partner Program**

23.     The deceptive sales tactics of solar panel installation contractors are enabled, facilitated, and ratified by the large financing companies like GOODLEAP that fund the projects. The industry is rife with scams due to the deputization of door-to-door salespersons tasked with signing vulnerable consumers up for tremendously expensive, multi-decade contracts and loans.[4]

customer-complaints-news-4-investigation/ (last visited September 22, 2023) (reporting that former Missouri Attorney General and now US Senator Eric Schmitt sues Pink Energy for making false promises and misrepresentations to consumers, deception, and concealing material facts); Press Release, Office of the Attorney General of Connecticut, *Attorney General Tong Sues Vision Solar Over Unfair and Deceptive Sales, Violations of Home Improvement Act* (March 16, 2023), available at https://portal.ct.gov/AG/Press-Releases/2023-Press-Releases/Attorney-General-Tong-Sues-Vision-Solar-Over-Unfair-and-Deceptive-Sales (last visited September 22, 2023) (disclosing that the Attorney General of Connecticut sued Vision Solar for preying on low-income, elderly, and disabled homeowners, pressuring them into unaffordable loans for solar panels that in some cases were never activated); David Lazarus, *Column: This Solar Company Wouldn't Let a Dead Woman out of Her Contract*, LA TIMES, June 1, 2021, available at https://www.latimes.com/business/story/2021-06-01/column-solar-power-dead-customer (reporting that Vivint (subsequently Sunrun) signed up a 91-year-old woman for solar panels weeks before her death and then steadfastly refused the family's pleas to cancel the contract after her death).

[4] *See, Vivint Solar Buyers Ink Deal in Predatory Sales Suit*, LAW360, Sept. 12, 2022, https://www.law360.com/articles/1529150/vivint-solar-buyers-ink-deal-in-predatory-sales-suit (last visited on October 19, 2022); Press Release, Better Business Bureau, *BBB Scam Alert: "Free solar panels" can cost you big time! How to spot a phony offer and find a trustworthy business* (September 22, 2023), available at https://www.bbb.org/article/scams/27595-bbb-scam-alert-free-solar-panels-can-cost-you-big-time-how-to-spot-a-phony-offer (last visited on September 28, 2023); Better Business Bureau Business Profile of Sunnova Energy Corporation, Current Alert of deceptive sales practices, available at https://www.bbb.org/us/tx/houston/profile/solar-energy-design/sunnova-energy-corporation-0915-90035524 (last visited September 28, 2023); Press Release, California Contractors State Licensing Board, *CSLB Warns Consumers to be Cautious of Misleading and Illegal Solar Advertisements* (April 17, 2023), available at https://www.cslb.ca.gov/Resources/PressReleases/2023/Illegal_Advertisements.pdf (last visited September 28, 2023); Better Business Bureau Business Profile of Solar Mosaic LLC, Current Alert of forced payments for solar services not received, available at https://www.bbb.org/us/ca/oakland/profile/financial-services/solar-mosaic-llc-1116-444414/complaints (last visited September 28, 2023); Randy Travis, *Georgia PSC 'getting lit up' with complaints about home solar ripoffs*, FOX5 ATLANTA, May 26, 2022, available at https://www.fox5atlanta.com/news/psc-getting-lit-up-with-complaints-about-home-solar-ripoffs (last visited September 28, 2023); Dale Yurong, *198 Fresno County residents cheated in solar power scam*, ABC30 FRESNO, September 19, 2019, available at https://abc30.com/fresno-county-fersno-scam-solar-fraud/5554203/ (last visited September 28, 2023); *Vivint Solar Investors Sue Brass Over Predatory Sales Worries*, LAW360, Mar. 10, 2020, https://www.law360.com/articles/1252108/vivint-solar-investors-sue-brass-over-predatory-sales-worries (last visited on October 19, 2022); Kurtis Ming, *California Establishes Fund for Victims of Solar Fraud*, CBS SACRAMENTO, Jul. 25, 2022, available at https://www.cbsnews.com/sacramento/news/california-establishes-fund-for-victims-of-solar-fraud/ (last visited on October 19, 2022); *CFPB Takes Action Against Fintech Company*

24.     GOODLEAP claims it is the largest lender and/or loan broker in the consumer solar marketplace. As of January 27, 2021, GOODLEAP controlled 41% of the solar panel lending market.[5] GOODLEAP's business model relies on the deceptive practices of its Partners in order to gain an advantage over its competitors. As of August 31, 2023, GOODLEAP had funded over $24 billion of solar and home improvement loans to 700,000 customers.[6]

25.     GOODLEAP administers a paperless lending platform that it says is "frictionless" and allows near-instant approval of multi-decade loans of tens of thousands of dollars. The focus of GOODLEAP's business is arranging loans to finance the purchase and installation of solar panels on the homes of individual consumers.

26.     To expand its business, GOODLEAP designed, implemented and oversees the "GOODLEAP Program." GOODLEAP entices solar installation contractors to join the GOODLEAP Program by promising that by doing so they will increase sales by up to 30%. Under the GOODLEAP Program the contractors become GOODLEAP's "Partners" and the sales agents of these "Partners" are deputized to simultaneously sell customers solar panels and arrange financing for the purchase of the solar panels through GOODLEAP loans. The availability of financing allows the "Partner" contractors to close more transactions.

27.     GOODLEAP vests the sales agents of its "Partners" with the authority to obtain

*GreenSky for Enabling Merchants to Secure Loans For Consumers Without Their Authorization*, CONSUMER FINANCIAL PROTECTION BUREAU, Jul. 12, 2021, https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-fintech-company-greensky-for-enabling-merchants-to-secure-loans-for-consumers-without-their-authorization/#:~:text=The%20CFPB%20issued%20a%20consent,to%20prevent%20future%20fraudulent%20loans (last visited October 19, 2022); Jeff Goldman, NJ.COM, Oct. 24, 2019, *Vivint Solar Agrees to Pay $122k Fine Over Charges of Deceptive Door-to-Door Sales Practices*, https://www.nj.com/news/2019/10/vivint-solar-agrees-to-pay-122k-fine-over-charges-of-deceptive-door-to-door-sales-practices.html (last visited October 19, 2022); *Vivint, Inc. to pay $375,000 to Resolve Allegations of Deceptive Advertising and Sales Practices*, Feb. 12, 2015, GEORGIA OFFICE OF THE ATTORNEY GENERAL CONSUMER PROTECTION DIVISION, https://consumer.georgia.gov/press-releases/2015-02-12/vivint-inc-pay-375000-resolve-allegations-deceptive-advertising-and-sales (last visited on October 19, 2022).

[5] Ari Levi, CNBC, *Exec Who Quit Solar City Now Runs the Leading Lender for Solar Installations,* Jan. 27 2021 https://www.cnbc.com/2021/01/27/hayes-barnard-turns-loanpal-into-billion-dollar-lender-after-solarcity.html (last visited on January 17, 2023).

[6] Cision PR Newswire, *GoodLeap Announces Closing of $470 Million Securitization Bringing the Company's Total to 18*, August 31, 2023, https://www.prnewswire.com/news-releases/goodleap-announces-closing-of-470-million-securitization-bringing-the-companys-total-to-18-301915376.html (last visited November 2, 2023).

COMPLAINT

nonpublic Personally Identifiable Information ("PII") from consumers, to submit loan applications on their behalf, and to obtain the consumers' credit reports. The "Partners" and their sales agents are GOODLEAP's agents in originating loans. Although GOODLEAP uses its "Partners'" sales agents to generate loans, it does not bother to verify whether the salespeople are properly licensed or even real people at all.

28.     GOODLEAP offers its "Partners" immediate, on-the-spot approval of the loan applications that they submit through an electronic, paperless process. This assures the "Partner" contractors that they can close transactions in minutes with the assurance that they will be promptly paid for every deal they close.

29.     GOODLEAP retains a portion of every loan generated by the sales agents of its "Partners" without disclosing this fee to the consumer. Thus, both GOODLEAP and the "Partner" contractors financially benefit from every loan generated by the sales agents of the "Partners" in the GOODLEAP Program. GOODLEAP is incentivized to keep "Partners" happy as they are GOODLEAP's agents and joint venturers in the GOODLEAP Program and the source of GOODLEAP's fees.

30.     The GOODLEAP Program enables and facilitates the exploitation of vulnerable consumers by unscrupulous solar installation contractors who become "Partners" in the GOODLEAP Program. There are no effective safeguards in the GOODLEAP Program to protect consumers. As a result, consumers are placed in loans that they did not authorize, whose terms they had no opportunity to review, and that they do not understand. GOODLEAP ratifies the entire process from application to funding.

31.     GOODLEAP's business model allows its "Partners" to reap massive profits from saddling consumers with tens of thousands of dollars in debt to which they never agreed. The GOODLEAP Program's paperless system, focus on speed, and financial incentives allow "Partners" to close sales transactions, lock customers into financing, receive immediate payment through the GOODLEAP Program, and be long gone by the time a consumer receives their first invoice from GOODLEAP, as in this case – PEN is out of business.

32.     GOODLEAP has elected to turn a blind eye to misconduct by its "Partners" and, despite

deputizing them with significant authority to lock consumers into loans, exercises virtually no oversight over their activities but ratifies all of their conduct nonetheless. Instead, GOODLEAP chooses to rely upon meaningless warranties and representations in contracts with its "Partners" and to pocket a portion of every loan generated by its "Partners."

33.     Lenders such as GOODLEAP have statutory duties not to engage in unfair acts and practices regarding loans to customers who did not authorize them under 12 U.S.C. §§5531(a) and 5536(a)(1)(B). A lender, such as GOODLEAP, also has a statutory duty under these same provisions not to engage in unfair acts and practices by structuring its loan origination and servicing activities in a manner that enables unauthorized loans. In designing, implementing, and overseeing the GOODLEAP Program in way that allows unauthorized loans, GOODLEAP has violated its statutory duties.

34.     PEN participated in the GOODLEAP Program and has been one of GOODLEAP's "Partners." It utilized a fraudulent scheme to saddle consumers with solar panel installation contracts and unauthorized loans to finance the purchase of the solar panels.

### GOODLEAP Violates Federal Law Regulating Credit Reporting

35.     The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. 1681 *et seq.*, was enacted to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Dutta v. State Farm Mut. Auto. Ins. Co.* (9th Cir. 2018) 895 F.3d 1166, 1169 (quoting *Safeco Ins. Co. of Am. v. Burr* (2007) 551 U.S. 47, 52).

36.     GOODLEAP violates the FCRA and its implementing regulations because it has not developed a statutorily compliant Identity Theft Prevention Program as required by 16 C.F.R. §681.1(d) ("Red Flags Rule"). *See also* 15 U.S.C. §1681m(e). GOODLEAP further violates the FCRA by obtaining consumer reports for reasons other than the statutorily permissible purposes. 15 U.S.C. 1681b(f).

### Red Flags Rule Violations

37.     Rules promulgated under the FCRA require that "[e]ach financial institution or *creditor* that offers or maintains one or more *covered accounts* must develop and implement a written Identity Theft Prevention Program (Program) that is designed to detect, prevent, and mitigate

identity theft in connection with the opening of a covered account or any existing covered account." 16 C.F.R. §681.1(d)(1) (emphasis added) (the "Red Flags Rule").

38. The Red Flags Rule adopts the definition of a "creditor" under the Equal Credit Opportunity Act as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. §1691a(e); 16 C.F.R. §681.1(b)(5). Further, the Red Flag Rule supplements that definition and requires that a creditor fulfill at least one of the three conditions in 15 U.S.C. §1681m(e)(4)(A). 16 C.F.R. §681.1(b)(5). Relevant here, a "creditor" for the purposes of the Red Flag Rule is one that "obtains or uses consumer reports, directly or indirectly, in connection with a credit transaction." 15 U.S.C. §1681m(e)(4)(A)(i).

39. GOODLEAP is a "creditor" required to comply with the Red Flags Rule because it "regularly extends, renews, or continues credit" to finance the purchase and installation of solar panels on the homes of individual consumers, *see* 15 U.S.C. §1691a(e), and it "obtains or uses consumer reports, directly or indirectly, in connection with [] credit transaction[s]"—namely, credit transactions for the sale of solar panels. 15 U.S.C. §1681m(e)(4)(A)(i).

40. The Red Flag Rule defines a "covered account" as: "[a]n account that a financial institution or creditor offers or maintains, primarily for personal, family, or household purposes, that involves or is designed to permit multiple payments or transactions, such as a credit card account, mortgage loan, automobile loan, margin account, cell phone account, utility account, checking account, or savings account." 16 C.F.R. §681.1(b)(3)(i).

41. The loan accounts GOODLEAP offers and maintains in connection with transactions for the sale of solar panels are "covered accounts" within the meaning of the Red Flag Rule because they are accounts that are used primarily for personal, family, or household purposes (i.e., non-commercial) and are designed to permit multiple payments.

42. Identity theft is defined as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. §1022.3(h).

43. A Program required by the Red Flags Rule "must be appropriate to the size and

complexity of the financial institution or creditor and the nature and scope of its activities," 16 C.F.R. §681.1(d)(1), and must contain "reasonable policies and procedures to":

> (i) Identify relevant Red Flags for the covered accounts that the financial institution or creditor offers or maintains, and incorporate those Red Flags into its Program;

> (ii) Detect Red Flags that have been incorporated into the Program of the financial institution or creditor;

> (iii) Respond appropriately to any Red Flags that are detected pursuant to paragraph (d)(2)(ii) of this section to prevent and mitigate identity theft; and

> (iv) Ensure the Program (including the Red Flags determined to be relevant) is updated periodically, to reflect changes in risks to customers and to the safety and soundness of the financial institution or creditor from identity theft.

44.     16 C.F.R. §681.1(d)(2). A "Red Flag" means "a pattern, practice, or specific activity that indicates the possible existence of identity theft." 16 C.F.R. §681.1(b)(9).

45.     The Program must be approved by a board of directors or an appropriate committee of the board of directors; involve senior level management in the oversight, development, implementation, and administration of the Program; train staff to effectively implement the Program; and exercise appropriate and effective oversight of service provider arrangements. 16 C.F.R. §681.1(e). Financial institutions or creditors that are required to develop a Program must consider the guidelines set forth in 16 C.F.R. §681, App. A, and include in their Programs the guidelines that are appropriate. 16 C.F.R. §681(f).

46.     GOODLEAP violates the Red Flag Rule because, on information and belief, it does not have an Identity Theft Protection Program that is appropriate to its size and complexity and designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account. See 16 C.F.R. §681.1(d)(1). It has no reasonable policies or procedures to identify relevant Red Flags and incorporate those Red Flags into a Program, to detect Red Flags, to respond appropriately to any detected Red Flags, or to periodically update its Program. See 16 C.F.R. §681.1(d)(2). It does not train staff on recognizing or responding to Red Flags. See 16 C.F.R. §681.1(e)(3). It has no policies and procedures for

exercising appropriate and effective oversight of its service providers, including the solar panel installers who travel door-to-door to sign up customers for GOODLEAP financing. *See* 16 C.F.R. §681.1(e)(4).

47. Further, GOODLEAP has not implemented the guidelines listed in 16 C.F.R. §681, App. A (the "Guidelines"). For example, the Guidelines list appropriate responses to the detection of identity theft, including closing an existing covered account and not attempting to collect on a covered account or not selling a covered account to a debt collector. 16 C.F.R. §681, App. A IV(f), (g). Despite having actual notice that Plaintiffs were the victim of identity theft, as they did not authorize the use of their personal information to be listed on the loan GOODLEAP extended to him, GOODLEAP took no or insufficient steps to investigate Plaintiffs' claim or open a fraud investigation. Instead, GOODLEAP falsely reported a past-due balance on a GOODLEAP account to consumer reporting agencies, damaging Plaintiffs' credit. GOODLEAP still alleges that Plaintiffs are obligated is on a loan to which they never consented.

48. The Guidelines also provide guidance for the oversight of service providers who perform activities in connection with covered accounts and recommend that "the financial institution or creditor should take steps to ensure that the activity of the service provider is conducted in accordance with reasonable policies and procedures designed to detect, prevent, and mitigate the risk of identity theft." 16 C.F.R. §681, App. A VI(c). This could include requiring the service providers to have policies and procedures to detect relevant Red Flags and either report such Red Flags to the creditor or take appropriate steps to prevent or mitigate the occurrence of identity theft. 16 C.F.R. §681, App. A VI(c). GOODLEAP does not exercise the requisite oversight over its Partners, who have near carte-blanche authority to enter customers into financing for the purchase of solar panels through GOODLEAP loans. GOODLEAP essentially rubberstamps the loan applications submitted by its Partners by offering immediate, on-the-spot approval, and does not perform sufficient investigation to ensure consumers – such as Plaintiffs – have consented to credit pulls or loans generated with the PII submitted by GOODLEAP's Partners.

49. GOODLEAP's failure to implement a compliant Identity Theft Protection Program enables systematic and widespread violations of the FCRA, damaging consumers who do not

have notice that they are obligated on expensive, multi-decade loans to which they never consented. Consumers also have no reasonable recourse once they learn their information has been used without their consent, since GOODLEAP does not maintain sufficient policies or procedures to investigate and mitigate the occurrence of identity theft.

**Permissible Use Violations**

50.    The FCRA prohibits persons from obtaining consumer reports for any reason other than a permissible purpose. 15 U.S.C. §1681b(f) ("A person shall not use or obtain a consumer report for any purpose unless . . . the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section."). Additionally, the entity using the credit report must certify truthfully that it is obtaining the consumer report for a permissible purpose. 15 U.S.C. §1681b(f)(2).

51.    GOODLEAP violates the permissible use prohibitions in the FCRA by obtaining and using consumer reports when GOODLEAP's sales representatives seek and obtain the consumer reports underlying GOODLEAP's extension of financing for the purchase of solar panels and do not consent to be borrowers on GOODLEAP loan agreements. Circumventing credit score limitations by pulling the credit report of a consumer, and then signing that person up as a borrower on expensive, multi-decade loans without their knowledge or consent, is not a permissible purpose under the FCRA.

**GOODLEAP and its Salespeople Entrapped Plaintiffs in Fraudulent Contracts**

52.    Plaintiffs are a husband and wife who live in a home in Adelanto that they purchased in 2015 for $125,000. They are each 74 years old. Daniel is in poor health, and he requires a nurse to come to Plaintiffs' home multiple times a week. Any stress causes his blood pressure to increase to dangerous levels, potentially requiring hospitalization. Amelia uses a walker due to severe back pain. Their sole income consists of Social Security benefits of approximately $2,200 per month.

53.    Plaintiffs are monolingual Spanish speakers. They cannot read or write in English and have only limited understanding of spoken English. Plaintiffs both have limited technological proficiency. Daniel did not have an email address at the time of this alleged transaction.

54.     Plaintiffs had never had any interest in solar panels and had never reached out to any company to inquire about solar panels. In January 2023, a Spanish-speaking door-to-door salesperson who said his name was "Mark Orozco" showed up at Plaintiffs' door. He said he was with PEN. Plaintiffs were both home at the time, but only Amelia spoke with Mark. Amelia learned that Mark was selling solar panels, and Mark gathered various information from Amelia, including her electricity bills and bank account information. Upon information and belief, he also obtained Plaintiffs' social security numbers.

55.     Mark told Amelia that if she purchased solar panels from him, she would only have to pay $104 per month for 19 years for all her energy. Mark had her touch his tablet in several places, including signing with a stylus. While Amelia was interested in solar panels at the price Mark said, Mark never provided her or showed her any documents in Spanish. The screens Mark showed Amelia on his tablet were all in English. She did not understand them and trusted that the screens said what Mark had told her. At no point did Mark tell her about a "loan" or that she would have a right to cancel any contract for five days (Amelia did not even know what, if anything, Mark was having her touch on his tablet).

56.     After some weeks passed, workers came to install the panels in or about February 2023. However, Amelia stopped them because she had not received any paperwork. Afterward, Mark arrived and gave her a copy of a "Custom Proposal for Daniel Perez" in English, which Amelia did not understand. She felt pressured to let the workers continue, and the workers installed the solar panels that same day.

57.     PEN never finished the job, and the panels have not functioned at all at any point. At a later date, Amelia looked over the "Customer Proposal" and realized that it did not have her name or signature on it. but it had Daniel's name and the signature was not his since he never signed anything or even participated in the sales presentation.

58.     On May 1, 2023, GOODLEAP made an ACH withdrawal of $105 on Plaintiffs' bank account. Plaintiffs had no idea what the charge was for, as Plaintiffs had never heard of GOODLEAP. Amelia called her bank and asked them to block the payment. In June 2023, Plaintiffs received a letter from GOODLEAP demanding payment. Plaintiffs had no idea who

this company was because Plaintiffs had never received information regarding payments for the solar panels. When Amelia called GOODLEAP, she was told that this was a loan taken out to pay for the solar panels. Amelia informed them that she had not taken out a loan with them and that the solar panels did not function. The representative said that was a complaint she should direct at the contractor not GOODLEAP.

59.    Amelia called Mark several times from her phone, and he would not answer. Amelia then tried calling him from her husband's cell phone and he did answer but then immediately hung up. Amelia has also called PEN directly, but PEN do not answer. Growing extremely concerned about this situation, Amelia reached out to the City of Adelanto's building department and Amelia was told that no solar panel installment permit was listed for her address.

60.    PEN's installation of the solar panels left holes in the Perezes' roof that have allowed water to leak into their living room when it rains.

61.    In August 2023, Mrs. Perez sought assistance from Housing and Economic Rights Advocates ("HERA").  In September 2023, HERA obtained a loan agreement from GOODLEAP written in English that shows electronic signatures with the names "Daniel Perez" and "Amelia Perez" and lists an email address of Danielperez76756@gmail.com.  However, as explained above, Daniel never signed any document and did not even participate in any discussions with Mark. Moreover, Daniel did not have any email address at that time, let alone this email address. Nor could either Plaintiff read this document – it is in English, when Plaintiffs speak, read, and write only in Spanish. Apparently, Mark, acting as the solicitor agent for GOODLEAP, used a false email address to forge Plaintiffs' electronic signatures after obtaining their PII. GOODLEAP then rat

62.    HERA sent a letter to GOODLEAP and PEN on Plaintiffs' behalf on October 4, 2023 outlining the events described above. GOODLEAP has failed and refused to take corrective action.

63.    GOODLEAP and its authorized agents exploited Plaintiff's vulnerabilities. Its partner salesperson did not provide Plaintiffs with a paper or electronic contract or agreement. Plaintiffs never consented to the use of electronic records to receive all disclosures they are entitled to

receive under the law, much less in a manner reasonably demonstrating that they could access the disclosures in an electronic form. Further, Plaintiffs did not and could not have intended to sign any agreement with GOODLEAP electronically, since they never knew about the GOODLEAP contract.

64.    Although Plaintiffs have previously canceled any alleged contracts, and such contracts are forged, rendering them void *ab initio*, this complaint shall constitute separate notice of the forgeries and the request for cancellation pursuant to the HSSA, Civil Code §§1689.7 and 1689(b)(1) and violations of the CLRA.

65.    Despite Plaintiffs' lawful cancellation of any alleged contract(s) and/or loan agreement(s) and notice of fraudulent activity, which were void *ab initio*, GOODLEAP refuses to acknowledge the lawful rescission and have declined to take any corrective action.

66.    GOODLEAP continues to claim that Plaintiffs are bound by contracts they never signed, thereby ratifying all actions taken by PEN and any sales agents.

67.    This ordeal has caused Plaintiffs' family tremendous stress. Daniel has diabetes, and GOODLEAP's actions have caused him stress, which has caused him to need hospitalization. Plaintiffs were worried that GOODLEAP might take their home. GOODLEAP's actions have had a severe negative effect on Plaintiffs and have caused them to suffer non-economic damages including emotional distress, stress, anxiety, and loss of enjoyment of life.

### FIRST CAUSE OF ACTION
**(Fraudulent Misrepresentation and Concealment)**
**(On behalf of PLAINTIFFS against GOODLEAP and DOES 1-20)**

68.    Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

69.    GOODLEAP made false representations to Plaintiffs including, but not limited to representing that Plaintiffs had signed and were obligated on a purported loan agreement that they never signed.

70.    These representations were false when made. GOODLEAP knew the representations were false or recklessly disregarded the truth. GOODLEAP intended for Plaintiffs to rely on the truth of these representations and they reasonably did so.

71.     GOODLEAP had a legal obligation to disclose any purported loan documents and related documents to Plaintiff, which included many material terms and conditions but intentionally concealed and did not disclose the above documents to Plaintiffs at any point before the installation of solar panels on Plaintiffs' home.

72.     The representations and intentional concealment by GOODLEAP were material and was willful, malicious, wanton, intentional, and reckless.

73.     Plaintiffs have been harmed by the representations and the representations were a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiffs prays for relief as set forth below.

## SECOND CAUSE OF ACTION
**(Violations of the Consumers Legal Remedies Act, Civil Code §1750, *et seq*.)**
**(On Behalf of Plaintiffs and the General Public Against GOODLEAP and DOES 1-20)**

74.     Plaintiffs realleges and incorporates by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

75.     The Consumers Legal Remedies Act, Civil Code §1750 *et seq.* ("CLRA") was designed and enacted to protect consumers from unfair and deceptive business practices. To this end, the CLRA sets forth a list of unfair and deceptive acts and practices in Civil Code §1770 that are prohibited in any transaction intended to result in the sale or lease of goods or services to a consumer.

76.     At all relevant times, each Plaintiff was a "consumer" within the meaning of the CLRA, Civil Code §1761(d). GOODLEAP and its agents are companies and, as such, are "persons" as that term is defined in California Civil Code §1761(c). The transaction from which this action arises was intended to result in the sale or lease of goods or services to a consumer and are covered by the CLRA.

77.     The acts and practices of GOODLEAP and its agents violated the CLRA and constitute the following unfair methods of competition and unfair or deceptive practices:

a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have in violation of

19
COMPLAINT

Civil Code §1770(a)(5);

b. Representing that goods or services are of a particular standard, quality, or grade, in violation of Civil Code §1770(a)(7);

c. Representing and advertising goods or services with the intent to not sell it as advertised in violation of Civil Code §1770(a)(9);

d. Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions, in violation of Civil Code §1770(a)(13);

e. Representing that a transaction confers or involves rights and remedies which it does not have or involve, or are prohibited by law in violation of Civil Code §1770(a)(14);

f. Representing that the subject of a transaction has been supplied in accordance with a previous transaction when it has not, in violation of Civil Code §1770(a)(16);

g. Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer, in violation of Civil Code §1770(a)(18); and

h. Inserting an unconscionable provision in a contract, in violation of Civil Code §1770(a)(19).

78. GOODLEAP and its agents' violations of the CLRA present a continuing threat to Plaintiffs and the public in that GOODLEAP and its agents continue to engage in the above-referenced acts and practices.

79. The acts and practices of GOODLEAP and its agents are willful, intentional, and approved by managing agents as detailed above. The acts and practice have harmed Plaintiffs, and Plaintiffs. Plaintiffs are sending a letter with the filing of the instant complaint certified mail return receipt requested and will amend to request damages 30 days after GOODLEAP receives the same, thereby satisfying all notice requirements.

80. This Complaint shall serve as further notice of the statutory violations described therein. GOODLEAP has failed and refused to make restitution or offer Plaintiffs adequate correction,

repair, relief, or other remedy.

81.     Additionally, GOODLEAP's violations of Civil Code §1770 present a continuing threat to members of the public in that GOODLEAP continues to engage in the alleged practices and has not ceased.

82.     Plaintiffs seek an injunction and any other relief the court deems proper pursuant to Civil Code §1780(a) and will amend to seek damages after expiration of the notice period.

83.     Plaintiffs are also entitled to an award of attorneys' fees and costs pursuant to Civil Code §1780(d).

WHEREFORE, Plaintiffs prays for relief as set forth below.

**THIRD CAUSE OF ACTION**
**(Violation of the Elder Abuse and Dependent Adult Civil Protection Act, Welfare & Institutions Code §15600, *et seq*.)**
**(On Behalf of Plaintiffs Against GOODLEAP and DOES 1-20)**

84.     Plaintiffs realleges and incorporate by reference as though fully herein each and every allegation contained in the preceding paragraphs.

85.   The California Legislature declared that elders are a "disadvantaged class" vulnerable to predatory practices when it enacted the Elder Abuse Act, a state law enforcing the civil rights of the elderly and disabled." Welf. & Inst. §15600. In enacting Elder Abuse Act, the Legislature recognized that elders may be subject to abuse and declared that the State "has a responsibility to protect them" from abuse, including financial abuse.

86.     The 2008 amendments to Elder Abuse Act created a conclusive presumption of financial abuse where a person or entity knew or should have known that their conduct was likely to be harmful to an elder. "A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." Welf. & Inst. §15610.30(b).

87.     Plaintiffs at all times relevant to the events described herein, were "elder" adults within the meaning of Welfare & Institutions Code §15610.27 because they are over the age of 65.

21
COMPLAINT

88.    At all times relevant herein, GOODLEAP actually knew or should have known based on their own observations that Plaintiffs were elder adults.

89.    The acts and omissions of GOODLEAP as above alleged constitute financial abuse of an elder adult within the purview and protections of the Welfare & Institutions Code §15610.07 in that they were the proximate cause of the financial abuse or other treatment with resulting physical harm, and pain or mental suffering to Plaintiffs. "Mental suffering" as used herein means fear, agitation, confusion, severe depression, or other forms of serious emotional distress that is brought about by forms of intimidating behavior, threats, harassment, or by deceptive acts performed, or false and misleading statements made with malicious intent to cause such mental conditions in an elder or dependent adult.

90.    GOODLEAP took undue advantage of Plaintiffs by misrepresenting and concealing material facts.

91.    In doing the acts alleged herein GOODLEAP took, secreted, appropriated, or retained (or else assisted in so taking, secreting, appropriating, or retaining) the property of Plaintiffs to a wrongful use, or with the intent to defraud, or both, the property of Plaintiffs, thereby causing them to suffer financial abuse.

92.    GOODLEAP are engaged in a pattern of financial elder abuse with a conscious disregard for Plaintiffs' rights, as well as recklessness, oppression, fraud, or malice in the commission of this abuse as defined by Civil Code §3294.

93.    As a direct and legal result of GOODLEAP's violations of the Elder and Dependent Adult Civil Protection Act in their dealings with Plaintiffs, Plaintiffs have suffered actual, consequential and incidental damages, including without limitation, with respect to Plaintiffs' mental suffering and emotional distress. Plaintiffs are also entitled to exemplary damages, particularly because GOODLEAP's predatory practices have been directed at especially vulnerable and unsophisticated consumers.

94.    Plaintiffs continue to suffer damages, the precise amount of which is unknown at the present time; the limitations of Code of Civil Procedure §377.34 do not apply here.

95.    In addition to all other remedies provided by law, pursuant to terms of Welfare &

Institutions Code §15675.5, Plaintiffs are entitled to actual damages and general damages, and all other forms of relief otherwise allowed by law.

96.     Plaintiffs are also entitled to treble damages under Civil Code §3345 which is calculated as three times the amount that the trier of fact otherwise awards in damages against GOODLEAP for its wrongful conduct.

97.     Pursuant to Welfare & Institutions Code §15657.5, Plaintiffs are entitled to an award for their reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

**FOURTH CAUSE OF ACTION**
**(Violation of the Fair Credit Reporting Act, 15 U.S.C. 1681, *et seq*.)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

98.     Plaintiffs reallege and incorporate by reference as though fully herein each and every allegation contained in the preceding paragraphs.

99.     GOODLEAP used Plaintiffs' consumer reports to determine their eligibility for a loan product, and they did so without Plaintiffs' knowledge or consent, without Plaintiffs having initiated or intending to initiate any credit transaction, and without a permissible purpose.

100.    GOODLEAP's willful and/or negligent conduct also includes, but is not limited to, the following:

a)  Continuing to give sales agents access to electronic tools that allow them to obtain and/or use a consumer's credit report without the consent of the consumer;

b)  Failing to adopt policies, procedures, and practices that would prevent sales agents from obtaining or using a consumer's credit report without the consent of the consumer;

c)  Failing to supervise sales agents to ensure that they would not obtain or use a consumer's credit report without the consent of the consumer;

d)  Failing to train sales agents to ensure that they would not obtain or use a consumer's credit report without the consent of the consumer;

e)  Disregarding complaints of fraudulent or deceptive conduct and/or impermissible credit pulls by sales agents; and,

f)    Employing quotas and/or sales goals/metrics that incentivize sales agents to obtain or use credit reports without the consent of the consumer.

101.    GOODLEAP's willful and/or negligent corporate action and/or inaction of obtaining and/or using Plaintiff's consumer report proximately caused damage to Plaintiffs.

102.    Plaintiffs seek actual and compensatory damages, punitive damages, statutory damages, and any other relief the Court deems proper.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**FIFTH CAUSE OF ACTION**
**(Violations of the Rosenthal Fair Debt Collection Practices Act, Civil Code §1788, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

103.    Plaintiffs reallege and incorporate herein by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

104.    The Legislature enacted the Rosenthal Act in 1976 to ensure the integrity of our banking and credit industry. Civil Code §1788.1(b). The Legislature found that "unfair or deceptive debt collection practices undermine the public confidence which is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers." Civil Code §1788.1(a)(1).

105.    At all times relevant herein GOODLEAP was and is a "debt collector" within the meaning of Civil Code §1788.2(c). GOODLEAP regularly and in the ordinary course of business, on behalf of itself or others, engages in acts and practices in connection with the collection of consumer debt.

106.    The debt which GOODLEAP is attempting to collect from Plaintiffs is a "consumer debt" within the meaning of Civil Code §1788.2(f). Plaintiffs are each "debtors" within the meaning of Civil Code §1788.2(h) in that he is natural person from whom GOODLEAP sought and continue to seek to collect a consumer debt alleged to be due and owing.

107.    GOODLEAP has a non-delegable duty under the Rosenthal Act not to commit violations of the Act, and not to allow its agents to commit such violations, which duty GOODLEAP is prohibited from violating.

108.    Since November 2022, GOODLEAP has attempted to collect non-existent debts from

Plaintiffs. GOODLEAP has contacted Plaintiffs by letter and phone, and collected amounts that are not owed as matter of law because Plaintiffs never entered into any contract with GOODLEAP, and furthermore lawfully rescinded any alleged contracts. Plaintiffs do not owe any amount to GOODLEAP.

109.    GOODLEAP made false representations that Plaintiffs owed monthly payments to GOODLEAP even though Plaintiffs never had any obligation to GOODLEAP.

110.    GOODLEAP has violated the Rosenthal Act. The violations include, but are not limited to the following:

    a.  GOODLEAP made and used false, deceptive, and misleading representations in an attempt to collect the fraudulent account, in violation of California Civil Code § 1788.17;[7]

    b.  GOODLEAP misrepresented the character, amount, or legal status of the fraudulent account, in violation of California Civil Code §§ 1788.13(e) and 1788.17;[8]

    c.  GOODLEAP misrepresented the compensation which may be lawfully received by GOODLEAP for the collection of the fraudulent account, in violation of California Civil Code §§ 1788.13(e), 1788.14(b), and 1788.17;[9]

    d.  GOODLEAP is attempting to collect the fraudulent account from Plaintiffs, an action that cannot lawfully be taken, in violation of California Civil Code 1788.13(e) and 1788.17;[10]

    e.  GOODLEAP misrepresented that the fraudulent account is lawfully owed by Plaintiff, in violation of California Civil Code § 1788.17;[11]

    f.  GOODLEAP is attempting to collect interest, fees, or other charges from Plaintiffs that are not expressly authorized by the law agreement creating the fraudulent account or otherwise permitted by law, in violation of California Civil Code §§ 1788.13(e) and 1788.17;[12]

---

[7] 15 U.S.C. §§ 1692e and 1692e(10).
[8] 15 U.S.C. § 1692e(2)(A).
[9] 15 U.S.C. § 1692e(2)(B).
[10] 15 U.S.C. § 1692e(2), 1692e(5) and 1692e(10).
[11] 15 U.S.C. § 1692e, 1692e(5), and 1692e(10).
[12] 15 U.S.C. § 1692f(1).

111.    Furthermore, GOODLEAP violated Civ. Code §1788.17, which requires every debt collector collecting or attempting to collect a consumer debt to comply with the provisions of 15 U.S.C. §1692b to §1692j of 15 U.S.C. §1692.

112.    As a proximate result of GOODLEAP's violations of the Rosenthal Act, Plaintiffs suffered damages in amounts to be proven at trial.

113.    Plaintiffs are entitled to recover his actual damages pursuant to Civil Code §1788.17, incorporating by reference 15 U.S.C. §1692k(a)(1), or in the alternative, Civil Code §1788.30(a), including, but not limited to, damages for his emotional distress.

114.    Plaintiffs are also entitled to recover statutory damages pursuant to Civil Code §1788.17, which incorporates by reference the remedies of 15 U.S.C. §1692k(a)(2)(A), or in the alternative, Civil Code §1788.30(b).

115.    Plaintiffs are entitled to attorneys' fees and costs pursuant to Civil Code §1788.17, incorporating by reference 15 U.S.C. §1692k(a)(3), or in the alternative, Civil Code §1788.30(c).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SIXTH CAUSE OF ACTION
**(Violations of the Home Solicitation Sales Act, Civil Code §1689.5, *et seq.*)**
**(On behalf of Plaintiffs Against GOODLEAP and DOES 1-20)**

116.    Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

117.    The Legislature enacted the HSSA in 1971 to protect California consumers against the type of pressures that arise when a sales agent appears at a buyer's home. Regardless of whether the buyer invites the seller to his/her home, serious pressure arises from the mere fact that the seller may be an intimidating presence once inside the buyer's home. A reluctant buyer can easily walk away from a seller's place of business, but he/she cannot walk away from his/her own home and may find that the only practical way of getting the seller to leave is to agree to buy what the seller is selling.

118.    As a result, the HSSA broadly defines "home solicitation" to mean "any contract, whether single or multiple, or any offer which is subject to approval, for the sale, lease, or rental

of goods or services or both, made at other than appropriate trade premises in an amount of twenty-five dollars ($25) or more, including any interest or service charges." Civil Code §1689.5(a). The definition focuses not on who initiated the contact between the buyer and the seller, but on where the contract was made.

119.    Because of these pressures, the Home Solicitation Sales Act gives the non-senior citizen consumer the right to cancel a home solicitation contract until midnight of the third business day after the buyer receives a signed and dated copy of the contract or offer to purchase that complies with Section 1689.7. Civil Code §1689.6(a)(2). This cancellation right is extended to five days for seniors.

120.    Home solicitation sales contracts must be:

written in the same language, e.g. Spanish, as principally used in the oral sales presentation, shall be dated, shall be signed by the buyer, and . . . shall contain in immediate proximity to the space reserved for the buyer's signature, a conspicuous statement in the size equal to at least 10-point boldface type, as follows:

(B) For all buyers: "You, the buyer, may cancel this transaction at any tie prior to midnight for the third business day after the date of the transaction. See the attached notice of cancellation form for an explanation of this right.

Civil Code §1689.7(a)(1); *see also* Civil Code §1689.7(a)(4).

121.    The precise contents of the notice of cancellation are set forth in the HSSA and cannot be modified.

122.    If a seller fails to strictly comply with these notice provisions, the buyer retains the right to cancel the contract until the seller complies with the HSSA. Civil Code §1689.7(c). The seller is not entitled to any compensation. Civil Code §§1689.11.

123.    The contracts that GOODLEAP seek to enforce against Plaintiffs were purportedly entered into at Plaintiffs' home, was not entered into at an "appropriate trade premise," is a contract for "goods" and/or "services" and are regulated by and subject to the HSSA.

124.    Plaintiffs exercised their statutory right to cancel any and all contract(s) GOODLEAP contends Plaintiffs entered into and hereby further informs GOODLEAP of their cancellation of any such contract(s).

125.    If the buyer cancels, the seller must return anything the buyer paid within ten (10) days of

the notice of cancellation.

126. The buyer must make the goods available to the contractor for twenty (20) days from the date of cancellation. If the seller fails to retrieve the goods, the buyer may keep the goods without further obligation.

127. PEN and GOODLEAP failed to timely respond to Plaintiffs' cancellation of the non-existent contracts. In violation of the HSSA, GOODLEAP has denied Plaintiffs their statutory right to cancel.

128. GOODLEAP violated Civil Code §1689.5, *et seq.* by failing to provide Plaintiffs with any fully executed contract signed by Plaintiffs and GOODLEAP and its agents, by failing to timely provide Plaintiffs with any notice of their statutory right to cancel, and by failing to return the amounts collected from Plaintiffs within ten (10) days of the date they exercised their statutory right to cancel any contracts GOODLEAP or its agents contend Plaintiffs entered into.

129. Plaintiffs received no fully executed contract because they never signed a contract with GOODLEAP, much less a Spanish contract, as Civil Code §1689.7(a)(1) requires for Irma and Jose.

130. An actual controversy exists between Plaintiff, on the one hand, and GOODLEAP, on the other hand, concerning their rights and duties under the HSSA. This controversy is ripe for adjudication. Plaintiffs are entitled to a declaratory judgment adjudicating the rights and duties of the parties under the HSSA.

131. Plaintiffs are entitled to actual or nominal damages pursuant to Civil Code §3360 for GOODLEAP's violations.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SEVENTH CAUSE OF ACTION
**(Violation of Business and Professions Code §7150, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

132. Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

133. In addition to its own violations of law, GOODLEAP is subject to all claims and defenses

that Plaintiffs have against PEN as the holder in due course.

134.   Business and Professions Code §7159(d) requires that "A home improvement contract and any changes to the contract shall be in writing and signed by the parties to the contract prior to the commencement of work covered by the contract or an applicable change order and, except as provided in paragraph (8) of subdivision (a) of Section 7159.5, shall include or comply with all of the following: (1) The name, business address, and license number of the contractor. (2) If applicable, the name and registration number of the home improvement salesperson that solicited or negotiated the contract."

135.   Business and Professions Code §7159(b) defines "home improvement contract" as "an agreement, whether oral or written, or contained in one or more documents, between a contractor and an owner or between a contractor and a tenant, regardless of the number of residence or dwelling units contained in the building in which the tenant resides, if the work is to be performed in, to, or upon the residence or dwelling unit of the tenant, for the performance of a home improvement, as defined in Section 7151, and includes all labor, services, and materials to be furnished and performed thereunder, if the aggregate contract price specified in one or more improvement contracts, including all labor, services, and materials to be furnished by the contractor, exceeds five hundred dollars ($500). "Home improvement contract" also means an agreement, whether oral or written, or contained in one or more documents, between a salesperson, whether or not they are a home improvement salesperson, and an owner or a tenant, regardless of the number of residence or dwelling units contained in the building in which the tenant resides, which provides for the sale, installation, or furnishing of home improvement goods or services."

136.   At all times relevant herein, GOODLEAP and its agents were engaged in "home improvement" under Business and Professions Code §7151 and in the sale of "home improvement goods or services" with "goods" and "services" being defined by Civil Code §1689.5.

137.   GOODLEAP alleges the existence of one or more "home improvement contracts" between GOODLEAP and/or PEN and Plaintiffs within the meaning of Business and Professions

29
COMPLAINT

Code §7151.2.

138.    Business and Professions Code §7153(a) specifies that "[i]t is a misdemeanor for any person to engage in the occupation of salesperson for one or more home improvement contractors within this state without having, at the time of the sales transaction, a current and valid home improvement salesperson registration issued by the registrar" and "[i]t is a misdemeanor for any person to engage in the occupation of salesperson of home improvement goods or services within this state without having, at the time of the sales transaction, a current and valid home improvement salesperson registration issued by the registrar."

139.    Unbeknownst to Plaintiff, the alleged, forged, GOODLEAP and PEN contracts contained multiple violations of Bus. & Prof. Code § 7159:

140.    Subdivision (c)(3)(A): The contractor did not give the buyer a copy of the contracts signed and dated by both the buyer and the contractor. The buyers did not receive a copy of the contract that initiates the buyer's rights to cancel the contract pursuant to sections 1689.5 to 1689.14, inclusive, of the civil code.

141.    Subdivision (d): The contract was not signed by the parties to the contract prior to the commencement of the work covered by the contract or any applicable change order. *Plaintiffs did not sign any contract.*

142.    Pursuant to Business and Professions Code §7161 the following proscribed acts are considered misdemeanors:

a)  Using false, misleading, or deceptive advertising as an inducement to enter into any contract for a work of improvement, including, but not limited to, any home improvement contract, whereby any member of the public may be misled or injured;

b)  Making any substantial misrepresentation in the procurement of a contract for a home improvement or other work of improvement or making any false promise of a character likely to influence, persuade, or induce any person to enter into the contract; and

c)  Any fraud in the execution of, or in the material alteration of, any contract, trust deed, mortgage, promissory note, or other document incident to a home improvement

30
COMPLAINT

transaction or other transaction involving a work of improvement.

143.   GOODLEAP's alleged contract contains a host of other Business and Professions Code §7161 violations not alleged herein which stem from the fact that Plaintiffs did not sign or receive the alleged contracts at the time GOODLEAP claims they became obligated on them.

144.   Liability for violations of these provisions by a home improvement salesperson extends to the contractor employing him or her. Business and Professions Code §7155.5. PEN and its salespersons acted as the agents of GOODLEAP for the purposes of the GOODLEAP Program.

145.   At all times relevant herein, GOODLEAP and its agents were under a duty to follow the law, including Business and Professions Code §§7153, 7159, and 7161. The aforementioned statutes were intended to protect against the type of harm suffered by Plaintiffs, Californians targeted by an unscrupulous home improvement salesperson for the sale of home improvement goods and services.

146.   GOODLEAP's agents breached their duty when GOODLEAP's sales agents made fraudulent misrepresentations including, but not limited to:

   a)  Concealing the fact that GOODLEAP and its agents were selling a solar installation contract and loan agreement,

   b)  Concealing the fact that GOODLEAP and its agents intended to use Plaintiff's PII to submit loan applications for Plaintiffs,

   c)  Concealing the fact that GOODLEAP and its agents were placing Plaintiffs in a solar installation contract, and

   d)  Concealing the fact that GOODLEAP and its agents were placing Plaintiffs in a loan agreement.

147.   GOODLEAP and its agents furthermore breached their duty by submitting a loan application for Plaintiffs, placing Plaintiffs in a solar installation contract, and placing Plaintiffs in a loan agreement, all without their knowledge or permission.

148.   As a direct and legal result of the wrongful acts and/or omissions of GOODLEAP, Plaintiffs suffered harm.

149.   Business and Professions Code §7160 also creates a private right of action, allowing that

"Any person who is induced to contract for a work of improvement, including but not limited to a home improvement, in reliance on false or fraudulent representations or false statements knowingly made, may sue and recover from such contractor or solicitor a penalty of five hundred dollars ($500), plus reasonable attorney's fees, in addition to any damages sustained by him by reason of such statements or representations made by the contractor or solicitor."

150.   Business and Professions Code §7153(b) provides that "Any security interest taken by a contractor, to secure any payment for the performance of any act or conduct described in Section 7151 that occurs on or after January 1, 1995, is unenforceable if the person soliciting the act or contract was not a duly registered salesperson or was not exempt from registration pursuant to Section 7152 at the time the homeowner signs the home improvement contract solicited by the salesperson."

WHEREFORE, Plaintiffs pray for relief as set forth below.

**EIGHTH CAUSE OF ACTION**
**(Violations of the Truth In Lending Act, 15 U.S.C. §1601, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

151.   Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the paragraphs above.

152.   The stated purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

153.   TILA mandates that lenders disclose certain costs of credit associated with the transaction. 15 U.S.C. § 1631(a) ("a creditor or lessor shall disclose to the person who is obligated on a consumer lease or a consumer credit transaction the information required under this subchapter").

154.   Terms such as "amount financed," "finance charge," "total of payments," and "annual percentage rate" must be used, as well as a "descriptive explanation" of each of these terms. 15 U.S.C. §1638(a)(2)-(5); Reg. Z, §1026.18(b), (d)-(e), (h).

155.   TILA mandates that these disclosures be written "clearly and conspicuously," and that

"[t]he terms 'annual percentage rate' and 'finance charge' shall be disclosed more conspicuously." 15 U.S.C. §1632(a); Reg. Z, §1026.17(a).

156.    TILA also requires the disclosure of "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments." 15 U.S.C. §1638(a)(6).

157.    "The creditor shall make disclosures before consummation of the transaction." Reg. Z, §1026.17(b).

158.    GOODLEAP did not comply with the requirements of the TILA.

159.    GOODLEAP did not provide any Plaintiff with disclosures of the "amount financed," "finance charge," and "annual percentage rate," nor any other disclosures, as GOODLEAP did not provide any Plaintiff any loan agreements or any related disclosures contemporaneously with the alleged loan transaction.

160.    GOODLEAP violated 15 U.S.C. §§ 1632(a), 1638(a)(2)-(6), and Reg. Z, §§ 1026.17-1026.18.

161.    Plaintiffs detrimentally relied on GOODLEAP's failure to provide the above disclosures, because had these disclosures been provided to Plaintiffs, they would have immediately cut off any potential transaction with GOODLEAP instead of being left unaware that loan had been taken in their names for solar panels they never agreed to purchase.

162.    As a result of GOODLEAP's failure to provide the above disclosures, Plaintiffs suffered damages including the purported loan obligation with its finance charge that GOODLEAP claims Plaintiffs are obligated on.

163.    Plaintiffs seek actual and compensatory damages, punitive damages, statutory damages, attorneys' fees and costs, and any other relief the Court deems proper.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**NINTH CAUSE OF ACTION**
**(Violations of Business and Professions Code §17200, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

164.    Plaintiffs reallege and incorporates by reference as though fully set forth herein each and every allegation contained in the paragraphs above.

165.    Plaintiffs have standing to bring this claim because they have lost money or property as a

result of the acts and practices alleged herein.

166.    The UCL defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice, and prohibits such conduct. Beginning on an exact date unknown to Plaintiff, but at all times relevant herein, GOODLEAP and its agents committed and are continuing to commit acts of unfair competition proscribed by the UCL, including the practices alleged herein.

167.    The business acts of GOODLEAP, as hereinabove alleged, constitute unlawful business practices.

168.    The business acts of GOODLEAP, as hereinabove alleged also constitute unlawful practices under federal law in at least four respects:

    a) GOODLEAP has engaged in unfair acts and practices with regard to originating loans and servicing loans to customers who did not authorize them in violation of 12 U.S.C. §§5531(a) and 5536(a)(1)(B);

    b) GOODLEAP has engaged in unfair acts and practices by structuring its loan origination and servicing activities in a manner that enables, facilitates and allows unauthorized loans in violation of 12 U.S.C. §§5531(a) and 5536(a)(1)(B);

    c) GOODLEAP has violated the FCRA's Red Flags Rule by failing to develop and implement a written Identity Theft Prevention Program that is designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account, 16 C.F.R. §681.1(d)(1);

    d) GOODLEAP has obtained and used consumer reports without a permissible purpose, in violation of the FCRA, 15 U.S.C. §1681b(f);

    e) GOODLEAP has violated Federal Trade Commission Holder in Due Course rule, 16 C.F.R. §433, *et seq*. by failing to comply with the Holder in Due Course Rule, including by refusing liability and instructing Plaintiffs that they have to deal with PEN to remedy any and all problems instead of GOODLEAP; and

    f) GOODLEAP has violated Financial Code §22161(a) by engaging in fraud or dishonest dealings, among other things.

g)

169.    The business acts and practices of GOODLEAP, as hereinabove alleged, constitute unfair business practices in that the acts and practices offend public policy and are substantially injurious to consumers. The acts and practices have no utility that outweighs the substantial harm to consumers.

170.    The business acts and practices of GOODLEAP as hereinabove alleged, constitute fraudulent business practices in that the acts and practices are likely to deceive the public and affected consumers as to their legal rights and obligations and avoid mandated disclosures; and by use of such deception, induce consumers to enter transactions which they otherwise would decline. The practices alleged are fraudulent and unfair, constituting deceptive practices which were predatory under the circumstances set forth herein.

171.    The unlawful, unfair, and fraudulent business acts and practices described herein present a continuing threat in that GOODLEAP and its agents are currently engaging in such acts and practices and will persist and continue to do so unless and until an injunction is issued by the Court.

172.    Pursuant to Business and Professions Code § 17203, Plaintiffs seek a public injunction for the unlawful, unfair, and fraudulent engaged in by GOODLEAP and its agents.

173.    Plaintiffs are entitled to restitution of all amounts taken by GOODLEAP and its agents.

174.    Plaintiffs are entitled to an award of attorneys' fees and costs in prosecuting this action under Code of Civil Procedure §1021.5 because:

a)    A successful outcome in this action will result in the enforcement of important rights affecting the public interest by protecting the general public from unfair, unlawful, and deceptive practices.

b)    This action will result in a significant public benefit by compelling GOODLEAP to comply with the law.

c)    Unless this action is prosecuted, GOODLEAP's activities will go unremedied and will continue unabated.

d)    Plaintiffs are individuals of modest means with limited access to the courts and

the civil justice system. Unless attorneys' fees, costs and expenses are awarded against GOODLEAP, Plaintiffs will not recover the full measure of their loss.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

(1)     An award of actual damages, including but not limited to, emotional distress damages;

(2)     An award of general damages;

(3)     An award of punitive damages;

(4)     An award of statutory damages;

(5)     An award of nominal damages;

(6)     An award of civil penalties;

(7)     An award of restitution;

(8)     An order finding and declaring that any alleged contracts between Plaintiffs and GOODLEAP and its agents, including PEN, have been cancelled and are void;

(9)     An order finding and declaring that the solar panels affixed to Plaintiffs' home are the property of Plaintiffs without obligation to pay for them;

(10)    An order finding and declaring that GOODLEAP's acts and practices challenged herein are unlawful, unfair, and fraudulent;

(11)    A comprehensive public injunction barring GOODLEAP from engaging in the unlawful, unfair, and fraudulent business practices challenged herein and compelling GOODLEAP to conform their conduct to the requirements of the law;

(12)    Prejudgment interest at the maximum legal rate;

(13)    An award of attorneys' fees, costs, and expenses incurred in the investigation, filing, and prosecution of this action; and

(14)    Any other and further relief as this Court shall deem just and proper.

//

//

//

36
COMPLAINT

Dated: January 13, 2024          KEMNITZER, BARRON & KRIEG, LLP

By:/s/ *Adam J. McNeile*
ADAM J. MCNEILE
KRISTIN KEMNITZER

HOUSING AND ECONOMIC RIGHTS ADVOCATES
JOSEPH JARAMILLO

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 13, 2024                    KEMNITZER, BARRON & KRIEG, LLP

                                           By:/s/ *Adam J. McNeile*
                                              ADAM J. MCNEILE
                                              KRISTIN KEMNITZER

                                           HOUSING AND ECONOMIC RIGHTS ADVOCATES
                                           JOSEPH JARAMILLO

COMPLAINT